## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

MONTANA CONNECTION, INC., )
et al., )
 )
      Plaintiffs, )
 )
v. )    No. 3:12-cv-0824
 )    Senior Judge Haynes
JUSTIN MOORE, et al., )
 )
      Defendants. )

## MEMORANDUM

Before the Court is Defendants' motion in limine to exclude the testimony of certain of Plaintiffs' expert witnesses (Docket Entry No. 184), namely the expert witness reports of Dr. Michael Einhorn, Loren Mulraine and Melissa Wald and their related anticipated testimony on damages. Defendants contend that Einhorn's report should be stricken and his testimony should be excluded because portions of his report exceed the scope of his expertise and that portions of his report would not assist the jury as such portions repeat factual assertions that Plaintiffs will most likely offer through other sources. Further, Defendants contend that Mulraine's and Wald's opinions should be excluded because most of their opinions are not based on specialized knowledge and exceed the scope of their expertise. Thus, Mulraine's and Wald's opinions would not be helpful to the jury.

In response (Docket Entry No. 206), Plaintiffs contend that their experts are qualified as experts by knowledge, skill, training, or education, and that their opinions are relevant and would assist a jury in deciding the issue of damages.

For the reasons set forth below, the Court concludes that Plaintiffs' proffered expert witnesses' opinions do not exceed the scope of their expertise and that their opinions would assist the jury on the issue of damages.

## A. Expert Witnesses

### 1. Dr. Michael Einhorn

Dr. Michael A. Einhorn is an economist with a Ph.D. in economics from Yale University and has worked since 1997 in the area of media and intellectual property. (Docket Entry No. 185-2 at 4). Einhorn is also a former professor of economics and law at Rutgers University and the author of *Media, Technology and Copyright: Integrating Law and Economics*. Id. at 30. Einhorn has written and/or published over 70 professional and academic articles, including 38 articles in the area of copyright and intellectual property and delivered 36 professional lectures or Continuing Legal Education seminars on those topics. Id. at 4-5. From 1997 to 2000, Einhorn worked as a staff economist at Broadcast Music, Inc. ("BMI") that is a collecting agency that licenses performance rights in music to major broadcasters, including television networks, local stations, cable companies, and radio stations. Id. at 4.

Since July 2000, Einhorn testified as an economist in court cases involving the valuation of the intellectual property owned by musicians, songwriters, music publishers, record labels, artists, photographers, actors, cartoonists, television producers, cable companies, and radio stations. Id. Einhorn has provided litigation support involving media economics and copyright damages that involved music, movies, television, advertising, branding, apparel, architecture, fine arts, video games, and photography. Id. at 30. Einhorn testified as an expert at depositions and/or trials on damages for copyright infringement in several cases. Id. at 5. Einhorn's expert analysis has not ever

2

been disqualified or limited by any court as to a matter of economic analysis. Id. Here, Plaintiffs requested Einhorn to provide an economic valuation of Plaintiffs' actual damages and additional profits of Defendants. Id. at 3.

### 2. Dr. Loren E. Mulraine

Dr. Loren E. Mulraine is "a law professor, entertainment attorney, singer, songwriter, producer, and artist manager based in Nashville, Tennessee." (Docket Entry No. 185-4 at 2). Mulraine is "the chief architect of the entertainment and music business certificate program at Belmont Law and my courses include Entertainment Law, Entertainment Practicum, Copyright Law, Mass Media Law, and Intellectual Property Law." Id. From 1998 to 2012, while at Middle Tennessee State University, Mulraine "taught Copyright Law, Contracts and Legal Issues, Commercial Songwriting, Artist Management, Music Publishing, and the graduate course, Legal Rights of Creative Individuals." Id. Mulraine has also released four solo recordings. Id. Mulraine states that the purpose of his report

> is to discuss the customs and practices in the music industry with respect to recording and performing artists, members of the artist's professional team, and the artist's various revenue streams, while identifying which roles Defendants in this case played with respect to the musical composition "Backwoods" and the 2009 album, Justin Moore, which contains the allegedly infringing track "Backwoods."

Id. at 3.

### 3. Melissa Wald

Professor Melissa Wald is a professor in the Department of Recording Industry, College of Mass Communication at Middle Tennessee State University, and tenured as an Associate Professor since 2012. Wald owns Copyright Solutions, "a consulting and copyright administration company serving music publishers, songwriters, recording artists and record labels in the areas of copyright

3

clearance, licensing and royalty calculations." (Docket Entry No. 185-6 at 2). Wald also has worked in copyright administration for music publishers and record labels, including designing royalty accounting systems. Id. at 13. Wald states that Plaintiffs requested her to provide an overview of the customs and practices of music publishers and administrators for publishers and record labels in the music industry based upon her experience in the music industry and as an Associate Professor and for her to discuss the proper method of licensing "In the Backwoods" for use in the composition "Backwoods" and on the 2009 album *Justin Moore*. Id. at 2.

## B. Conclusions of Law

For the admission of expert testimony, the Court serves as gatekeeper to ensure that juries are protected from misleading or unreliable evidence from the expert. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). This gatekeeping role of the trial judge with respect to expert testimony also applies to testimony based on specialized knowledge, as well as to scientific or other technical knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). A properly qualified expert witness may testify in the form of an opinion when the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.[1] Federal Rule of Evidence 704 provides

---

[1]Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;(b) the testimony is based on sufficient facts or data;(c) the testimony is the product of reliable principles and methods; and(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704. Yet, expert testimony cannot include terms that have a distinct legal meaning. Berry v. City of Detroit, 25 F.3d 1342, 1351-53 (6th Cir. 1994).

In addition to Fed. R. Evid. 702's general standards to assess reliability, the Supreme Court in Daubert provided a non-exhaustive list of factors that trial courts may consider in evaluating the reliability of expert testimony, including: "(1) whether a theory or technique can be or has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community." Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Daubert, 509 U.S. at 593–94). "'[T]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" Kumho, 526 U.S. at 150 (citation omitted). "Thus, whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Id. at 153; In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529 (6th Cir. 2008) ("[T]he Daubert factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'") (quoting Gross v. Comm'r, 272 F.3d 333, 339 (6th Cir. 2001)).

Defendants assert that "[w]hile Dr. Eichorn may be qualified to offer an opinion on *some* issues regarding the calcuation of revenues generated by Defendants' exploitation of *Backwoods*, Dr. Einhorn's report goes far beyond his expertise, intertwining into his report his purported expert

opinions on issues of musicology, legal principles and marketing which are highly inappropriate, inadmissible, and are designed or at least pose a legitimate risk of confusing the trier of fact," and that "his report is designed to persuade on a number of issues outside the scope of an economist's area of expertise." (Docket Entry No. 185 at 4) (emphasis in original). Defendants contend that "[r]ather than opining on subjects on which he is qualified – the computation of revenues relating to the exploitation of Defendants' song – Dr. Einhorn has become an advocate for Plaintiffs on issues ranging from musicology to marketing. . . . because his reports, at their core, are little more than smorgasbords of plaintiff-friendly factual evidence[.]" Id. Defendants further contend that "vast swaths of Dr. Einhorn's report merely restate evidence that is irrelevant to his expert opinion regarding the calculation of alleged damages and is evidence that Plaintiffs may introduce through fact witnesses." Id. at 5.

Plaintiffs contend that "Defendants' premise in filing this motion appears faulty in that the defense does not recognize actual damages as an element of Plaintiffs' damages," and that "[o]ne recognized calculation of actual damages is that of lost license revenue." (Docket Entry No. 206 at 10). Plaintiffs contend that "Dr. Einhorn is qualified under Fed. R. Evid. 702 to render his opinion on the valuation of Plaintiffs' damages arising from the infringement of their musical composition as alleged," and that "Dr. Einhorn's report contains analysis of a variety of factors that would affect the fair market value of the license fee that Plaintiffs lost as a result of Defendants' infringement." Id. at 9, 10. Plaintiffs further contend that Dr. Einhorn must show the facts upon which he relied in evaluating the damages Plaintiffs suffered.

Title 17 United States Code Section 504 provides, in part:

6

(a) In General.--Except as otherwise provided by this title, an infringer of copyright is liable for either--

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

(b) Actual Damages and Profits.--The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C § 504(a), (b).

"'Actual damages are generally calculated with reference to the loss in the fair market value of the copyright, often measured by the profits lost as a result of the infringement.'" Cotter v. Christus Gardens, Inc., 238 F.3d 420 (6th Cir. 2000) (quoting Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1170 (1st Cir. 1994)). "Another way of measuring actual damages is the extent to which the market value of the copyrighted work has been injured or destroyed, in other words, what a willing buyer would have been reasonably required to pay a willing seller." Rainey v. Wayne State Univ., 26 F. Supp. 2d 963, 970 (E.D. Mich. 1998) (citing Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc., 772 F.2d 505, 512 (9th Cir.1985)); Christopher Phelps & Associates, LLC v. Galloway, 492 F.3d 532, 539-40 (4th Cir. 2007) ("Actual damages for infringement are measured according to market value, which means what a willing buyer would have been reasonably required to pay a willing seller for the copyright holder's work."). "[A] copyright owner's 'actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer.'" Thoroughbred Software Int'l,

Inc. v. Dice Corp., 488 F.3d 352, 359 (6th Cir. 2007) (quoting Davis v. Gap, Inc., 246 F.3d 152, 167 (2d Cir. 2001)).

The Court concludes that Einhorn's qualifications are sufficient to offer an expert opinion on the calculation of actual damages relating to Plaintiffs' claims of infringement, as well as the "infringer's profits." Dr. Einhon may also cite the facts upon which he relied in evaluating Plaintiffs' damages. Fed. R. Evid. 703. The Court concludes that Dr. Einhorn's background established that his analyses and opinions as to actual damages, Defendants' gross revenues and the propriety of Defendants' deductions will be helpful to the trier of fact. See Fed. R. Evid. 702.

As to Mulraine, Defendants assert that while Mulraine may be qualified to testify generally about the customs of the music industry, "those customs are of little, if any, value to the trier of fact,"as Mulraine proposes to testify about such things as "who a 'recording artist' or a 'songwriter' is," although "[s]urely every potential juror knows what those terms mean." (Docket Entry No. 185 at 8). Defendants assert that both parties have fact witnesses who can and explain these terms. Defendants also contend that much of Mulraine's opinion is irrelevant as he discusses irrelevant topics such as explaining how new musicians get the "artist's brand out;" artists' selling CDs from their own websites and at shows; how publishing income can vary widely based on a number of factors; and the range of artist royalties, recoupment and the basis for calculating royalties. Lastly, Defendants contend that Mulraine's statement that in his opinion, based upon his experience in the entertainment industry, "Justin Moore's award winning Top Ten single *Backwoods* and his certified Gold Album *Justin Moore* benefitted all of the Defendants while enhancing the reputation and industry stature of, and career opportunities for, Justin Moore and the other Defendants on his

8

professional team" should be stricken as a vague and speculative conclusion. Id. at 9 (citing Docket Entry No. 185-4 at 13).

In response, Plaintiffs argue that explaining the customs and practices of the recording industry requires the specialized knowledge of an individual with experience and education in the field and determining how business and revenue streams operate between the many players in the music industry requires expertise. Plaintiffs also assert that in addition to "recording artist" and "songwriter" Mulraine also describes other players in the music industry, including "Loan Out Company," "Personal Manager," "Business Manager," "Publicist," "Booking Agent," "Merchandise Company," "Record Label," "Record Distributor," "Record Producer," and "Music Publisher." (Docket Entry No. 206 at 17). Plaintiffs further assert that in challenging the admissibility of Mulraine's final conclusion, Defendants ignore Dr. Mulraine's qualifications, the preceding eleven pages of explanations of the customs and practices of players in the music industry, and the preceding paragraph analyzing the specific players involved in this action.

The Court concludes that Mulraine is qualified to offer an expert opinion on the customs and practices of the music industry and his testimony would be relevant in helping the trier of fact understand the parties' roles and their industry activities and the income streams from which artists make their money.

Lastly, Defendants contend that although Wald's education, training and experience may qualify her to serve as an expert in the customs of music publishers, those customs are irrelevant in this action. Defendants further contend that discussions of licensing fees, the bundle of rights that comprise a sound recording and Wald's explanation of the Digital Millennium Copyright Act of 1998 do not have any relevance in this action.

9

Plaintiffs contend that the licensing revenue lost as a result of Defendants' infringement of Plaintiffs' composition is a recognized measure of actual damages under the Copyright Act and Wald explains the manner in which Plaintiffs' composition should have been licensed by Defendants.

The Court concludes that Wald's qualifications are sufficient to offer an expert opinion on the customs of music publishers and that her testimony would be helpful to the trier of fact in understanding music publishing and the licensing of musical compositions in determining damages.

Accordingly, for these reasons, the Court concludes that Defendants' motion in limine to exclude the testimony of certain of Plaintiffs' expert witnesses (Docket Entry No. 184) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _4_ day of December, 2015.

William J. Haynes, Jr.
Senior United States District Judge